STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 CA 0100

ESTHER REDMANN GIAVOTELLA

VERSUS

RYAN MITCHELL AND THE TRAVELERS INDEMNITY COMPANY

Judgment Rendered: OCT 2 4 2019

* * * * *

On Appeal from the
Eighteenth Judicial District Court
In and for the Parish of West Baton Rouge
State of Louisiana
Docket No. 42,796

Honorable J. Kevin Kimball, Judge Presiding

* * * * *

Kirk A. Guidry                          Attorneys for Appellant/Plaintiff
B. Scott Andrews                        Esther Redmann Giavotella
Baton Rouge, Louisiana

John W. Redmann
Edward L. Moreno
Gretna, Louisiana

David J. Calogero                       Attorney for Appellees/Defendants
Lafayette, Louisiana                    Ryan Mitchell and The Travelers
                                        Indemnity Company

* * * * *

BEFORE:   HIGGINBOTHAM, PENZATO, AND LANIER, JJ.

**PENZATO, J.**

Plaintiff, Esther Redmann Giavotella, appeals a judgment rendered in accordance with a jury verdict as well as a judgment granting the judgment notwithstanding the verdict filed by defendants, Ryan Mitchell and The Travelers Indemnity Company, and denying plaintiff's motion for judgment notwithstanding the verdict and alternative motions for new trial and/or additur, which partially amended the original judgment. Defendants have answered the appeal seeking to reduce the amount of damages awarded to plaintiff by the jury. For the reasons that follow, we affirm the judgments and deny the answer to plaintiff's appeal.

## FACTS AND PROCEDURAL HISTORY

Plaintiff originally filed this matter against defendants[1] following a rear-end multi-vehicle collision on I-10 in Baton Rouge, Louisiana, on April 8, 2015. On the date of the accident, she was driving a Toyota Camry and was hit by a GMC 2500 HD truck, which was driven by Mitchell. Immediately following the accident, plaintiff began experiencing a severe headache, and she visited an emergency room the next day with head, back, neck, and shoulder pain. Plaintiff subsequently treated with a chiropractor and an orthopedist, receiving conservative care, including medication. Dr. Jason Smith, an orthopedic surgeon, originally treated plaintiff on April 24, 2015, and ordered an MRI, which was performed on April 29, 2015. Dr. Smith testified that the MRI revealed a protruding disc at C5-6 and explained that the disc was not impinging on the spinal cord nor was it completely herniated. Dr. Smith recommended an epidural steroid injection (ESI), but did not recommend surgery at that time. Plaintiff also treated with Dr. Mohamed Elkersh, a pain management doctor, beginning May 6, 2015, for cervical radicular pain. Plaintiff was prescribed various medications by Dr. Elkersh, and

---

[1] Mitchell's employer was originally named as a defendant but was dismissed by summary judgment on February 22, 2018.

2

she underwent an ESI on May 26, 2015. She also received trigger point injections, electro acupuncture treatment, and physical therapy.

On November 30, 2015, plaintiff was involved in a subsequent rear-end collision while driving a van. The automobile that hit her was a small compact car, and her van required repairs of less than $1000.00. She returned to Dr. Elkersh, and underwent a second MRI on December 2, 2015, which evidenced a disc protrusion at C5-6. She received a second ESI on December 8, 2015, and a third MRI was performed on that date. Plaintiff testified that despite all the treatment she received, she was only ten percent improved prior to the November 30, 2015 accident. As she was still complaining after receiving conservative treatment, she was referred to a neurosurgeon.

Plaintiff began treating with Dr. Donald Dietze, a neurosurgeon, on March 10, 2016, for complaints of neck pain. Dr. Dietze reviewed the prior medical records of plaintiff and performed an examination. He opined that plaintiff suffered a disc herniation from the April 8, 2015 accident, which did not completely resolve by the November 30, 2015 accident. On his first visit with plaintiff, Dr. Dietze discussed the option of surgery, as well as other treatment options. Because she had been living with symptoms for almost a year when he first saw her, Dr. Dietze determined that she was a surgical candidate at the first visit. Dr. Dietze attempted conservative treatment, and on April 18, 2016 and September 21, 2016, plaintiff underwent bilateral nerve root blocks at C5-6. She returned to Dr. Elkersh on October 19, 2016, and received an additional trigger point injection and more medication. On December 8, 2016, plaintiff underwent a C5-6 cervical discectomy and artificial disc replacement performed by Dr. Dietze. At the time of plaintiff's surgery, the artificial disc replacement was a relatively new type of joint replacement. Plaintiff experienced complications and had to stay in the intensive care unit for approximately five days.

3

On October 30, 2017, the trial court granted plaintiff's motion for partial summary judgment on liability against Mitchell for causing the April 8, 2015 accident. Thereafter, the matter proceeded to a jury trial on March 12, 2018, on the issues of causation and damages, specifically whether the December 8, 2016 surgery was caused by the April 8, 2015 accident or the subsequent November 30, 2015 accident, and the amount of damages resulting from the April 8, 2015 accident.

Dr. Dietze testified at the trial that the April 8, 2015 accident definitely, rather than more probably than not, caused plaintiff to undergo the December 8, 2016 surgery. Dr. Dietze stated that plaintiff had no changes in her clinical exam or in the pathology shown on the MRI following the November 30, 2015 accident. Dr. Shelly Savant, an expert in the fields of neurology, psychology, and life care planning, presented a life care plan for plaintiff (Savant life care plan), indicating that based upon her injuries, plaintiff would have a total future lifetime cost of $2,498,243.05.

Dr. Everett Robert, Jr., an expert in the field of neurosurgery, testified on behalf of defendants. Defendants retained Dr. Robert to perform an independent medical examination (IME) of plaintiff on November 18, 2016, prior to her surgery on December 8, 2016. On the same date the IME took place, Dr. Robert issued a report pursuant to La. C.C.P. art. 1465.[2] Dr. Robert issued an addendum to his

---

[2] Louisiana Code of Civil Procedure article 1465(A) provides:

> If requested by the party against whom an order is made under Article 1464 or by the person examined, the party causing the examination to be made shall deliver to him a copy of a detailed written report of the examining physician setting out his findings, including results of all tests made, diagnoses, and conclusions, together with like reports of all earlier examinations of the same condition. After delivery the party causing the examination shall be entitled upon request to receive from the party against whom the order is made a like report of any examination, previously or thereafter made, of the same condition, unless, in the case of a report of examination of a person not a party, the party shows that he is unable to obtain it. The court on motion may make an order against a party requiring delivery of a report on such terms as are just, and if a physician fails or refuses to make a report the court may exclude his testimony if offered at the trial.

4

report on December 31, 2016, and a third report on September 5, 2017, explaining his comparison of the three available MRIs. Plaintiff asserts that none of the three reports issued by Dr. Robert mentions the life span of an artificial disc or plaintiff's need for future medical care or lack thereof.

Dr. Robert agreed that plaintiff was suffering from a herniated C5-6 disc and was a candidate for surgery. However, it was his opinion that prior to the November 30, 2015 accident, plaintiff's symptoms were being managed conservatively. Therefore, Dr. Robert did not agree that plaintiff was a surgical candidate regardless of the November 30, 2015 accident. He testified that plaintiff was a surgical candidate because her symptoms worsened after the November 30, 2015 accident when conservative measures no longer worked. Dr. Robert testified that the two December 2015 MRIs revealed a worsening of the C5-6 disc after the November 30, 2015 accident, which was the cause of her worsening symptoms and the cervical surgery. Dr. Robert testified that there was no indication that an artificial disc would need replacement in thirty years, as was contained in the Savant life care plan. He also testified that plaintiff would not need any durable medical equipment in the future such as a wheelchair or walker. He further opined that plaintiff would not need other future care, such as a nutritional consultant, an occupational therapy evaluation, or physical therapy. Dr. Robert did not agree that plaintiff needed all the medications listed in the Savant life care plan.

Plaintiff objected to portions of Dr. Robert's testimony as being outside of his report and outside his area of expertise. She claimed that Dr. Robert, as a neurosurgeon, should not have been permitted to testify as to her future medical needs, or lack thereof, and the fact that he would so testify was never disclosed in his reports written pursuant to La. C.C.P. art. 1465. Plaintiff further argued that Dr. Robert had not seen her since November 18, 2016, when he conducted the IME and had not considered any information, records, or depositions regarding her post-

surgical progress. Stanford McNabb, an expert in vocational rehabilitation and life care planning, submitted a life care plan (McNabb life care plan) on behalf of defendants that indicated that plaintiff's future medical needs were $10,578.00. Mr. McNabb testified that Dr. Robert provided the foundation for the recommendations contained in the life care plan submitted by the defendants.

The jury determined that plaintiff was injured as a result of the April 8, 2015 automobile accident. The jury awarded plaintiff $200,000.00 for past medical expenses (which was more than plaintiff had requested) and $12,000.00 for future medical expenses, along with other damages for a total of $500,000.00. The trial court signed a judgment in conformity with the jury verdict on March 28, 2018. Defendants filed a motion for judgment notwithstanding the verdict, claiming that the past medical expenses should be reduced to $108,090.84, the amount proven by plaintiff. On July 11, 2018, the trial court granted the JNOV, reducing the past medical expenses to $108,090.84 and the entire judgment amount to $408,090.84. In this same judgment, the trial court denied plaintiff's motion for JNOV and alternative motions for new trial and/or additur, which sought an increase in the awards for future medical expenses, future pain and suffering, and future loss of enjoyment of life pursuant to La. C.C.P. arts. 1811(F) and 1814. Plaintiff appeals the March 28, 2018 judgment and the July 11, 2018 judgment.[3]

## ASSIGNMENTS OF ERROR

Plaintiff claims that the trial court erred in allowing Dr. Robert to testify regarding future medical needs, asserting that his testimony was new expert medical opinion not properly disclosed to plaintiff, was outside Dr. Robert's area

---

[3] Inexplicably, the trial court signed a judgment on September 14, 2018, that was identical to the July 11, 2018 judgment. Once a trial court has rendered a valid final judgment, it has no authority to render a second final judgment, which is practically identical to the first judgment and adjudicates the same issues. *See Ahmed v. Bogalusa Kidney Care Ctr.*, 560 So. 2d 485, 486 (La. App. 1st Cir.), *writ denied*, 564 So. 2d 324 (La. 1990).

of medical expertise, lacked any competent basis or foundation, and interdicted the jury verdict. Plaintiff also claims that the jury erred in awarding her only $12,000.00 for future medical expenses.

## STANDARD OF REVIEW

The appellate court's review of factual findings is governed by the manifest error/clearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record further establishes that the finding is not manifestly erroneous. *Rideau v. State Farm Mut. Auto. Ins. Co.*, 2006-0894 (La. App. 1st Cir. 8/29/07), 970 So. 2d 564, 571, *writ denied*, 2007-2228 (La. 1/11/08), 972 So. 2d 1168. Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. *Rideau*, 970 So. 2d at 571.

A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding as to issues of material fact, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*. *Rideau*, 970 So. 2d at 571.

Plaintiff claims that the trial court committed evidentiary errors that interdicted the fact-finding process by admitting new expert medical testimony regarding future medicals that was not properly disclosed to her, was outside Dr. Robert's area of medical expertise, and that lacked any competent basis or

7

foundation. If evidentiary errors interdict the fact-finding process, this court must conduct a *de novo* review. Therefore, because a finding of an evidentiary error may affect the standard of review we should apply, we will address the alleged evidentiary error first in this appeal. *See Wright v. Bennett,* 2004-1944 (La. App. 1st Cir. 9/28/05), 924 So. 2d 178, 182. We note, however, that in regard to the plaintiff's allegations of error as to whether the trial court improperly admitted certain evidence, the trial court is granted broad discretion in these rulings and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. *Wright,* 924 So. 2d at 183, (*citing Turner v. Ostrowe,* 2001-1935 (La. App. 1st Cir. 9/27/02), 828 So. 2d 1212, 1216, *writ denied,* 2002-2940 (La. 2/7/03), 836 So. 2d 107).

Also at issue is the July 11, 2018 judgment denying plaintiff's motion for JNOV and alternative motion for new trial and/or additur. Louisiana Code of Civil Procedure article 1811 provides that a party may move for a JNOV and that a motion for new trial may be joined with the motion. A JNOV can be granted only when the trial court finds that reasonable minds could not reach a contrary verdict. *Adams v. Parish of East Baton Rouge,* 2000-0424 (La. App. 1st Cir. 11/14/01), 804 So. 2d 679, 687; *Davis v. Wal-Mart Stores, Inc.,* 2000-0445 (La. 11/28/00), 774 So. 2d 84, 89. The trial court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *Adams,* 804 So. 2d at 687.

In general, the standard of review of a JNOV on appeal is twofold. First, we must determine whether the jury verdict is supported by competent evidence and is not wholly unreasonable. If the verdict is supported by competent evidence and not wholly unreasonable, then the trial court may not set it aside. To make this determination, we must, after considering all of the evidence in the light most favorable to the party opposing the motion, find that it points so strongly and

8

overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. Second, after determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. *Daigle v. United States Fidelity and Guaranty Insurance Company*, 94-0304 (La. App. 1st Cir. 5/5/95), 655 So. 2d 431, 436.

## LAW AND DISCUSSION

### Admissibility of Dr. Robert's Testimony as to Future Medical Expenses

### Scope of Dr. Robert's Medical Report

Plaintiff argues that Dr. Robert's opinions regarding future medical care went beyond the scope of his La. C.C.P. art. 1465 medical report, were new and inadmissible opinion testimony, and were not properly disclosed. Article 1465(A) requires a party causing an IME to be conducted to "deliver to [the opposing party] a copy of a detailed written report of the examining physician setting out his findings, including results of all tests made, diagnoses, and conclusions, together with like reports of all earlier examinations of the same condition." Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. La. C.E. art. 103. Therefore, we must determine whether the trial court abused its discretion in allowing Dr. Robert's testimony regarding future medical care, and if so, whether the error was prejudicial to plaintiff.

Plaintiff argues that she had no indication that at the trial Dr. Robert would provide new medical opinions that future replacement of the artificial disc was not warranted and that most of the other elements in the Savant life care plan were not derivative of either accident. Dr. Robert conducted an IME on November 18, 2016, almost a year after the November 30, 2015 accident, and issued a report on that date, concluding that plaintiff had a herniated disc at C5-6 and that she could

be a candidate for a C5-6 anterior cervical discectomy and fusion. At the time he indicated that he had in his possession the April 29, 2015 MRI images, but only the reports from the December 2, 2015 and December 8, 2015 MRIs of plaintiff. Dr. Robert issued an addendum to his report on December 31, 2016, stating that he now had access to the two December 2015 MRI images, which he intended to review. On September 5, 2017, Dr. Robert issued a third report after comparing the two December 2015 MRI images with the April 29, 2015 MRI image. He determined that the December 2, 2015 MRI, performed a few days after the November 30, 2015 accident, revealed increased spinal stenosis and neuroforaminal stenosis when compared to the April 29, 2015 MRI. Dr. Robert noted that based on the medical records, plaintiff's complaints of pain increased after the November 30, 2015 accident, and that she had no surgical recommendations prior to that accident. Therefore, he opined that the November 30, 2015 accident exacerbated her pain and worsened her condition to the degree that she required cervical spinal surgery.

Mr. McNabb met with Dr. Robert on December 1, 2017, to discuss the Savant life care plan. The McNabb life care plan was produced to plaintiff, along with Mr. McNabb's handwritten notes from his conference with Dr. Robert. Mr. McNabb issued a December 11, 2017 letter regarding the medical conference he conducted with Dr. Robert where the two discussed the Savant life care plan and the elements Dr. Robert determined were "exclusively derivative to the 4/8/15 accident verses [sic] the 11/30/15 MVA."

At trial, Dr. Robert testified that he disagreed with the Savant life care plan's recommendation that plaintiff's artificial disc would have to be replaced in thirty years. He explained that he was certified to perform artificial disc surgeries, and when discussing the risks with a patient, he would not inform the patient of the need to have a replacement in thirty years. He also asserted that although certain

10

procedures and conditions might be possible in plaintiff's future, it is very difficult to determine whether those procedure and conditions are more probable than not in plaintiff's future. Dr. Robert testified that even if plaintiff's artificial disc did fail, such operations usually result in a fusion, which is an older procedure, not necessarily a replacement of the artificial disc. He disagreed with many recommendations of the Savant life care plan, such as the need for any future durable medical equipment; any future evaluations, including family therapy, nutritional consultation, physical medicine rehabilitation, occupational therapy, physical therapy, sleep medicine, or vocational rehabilitation; any future testing, such as MRIs, CT scans, or X-rays; any future laboratory testing; or any future ESIs. He further opined that many medications recommended in the Savant life care plan were not related to the cervical spine surgery and/or certain medications should only be taken for a limited period of time rather than thirty years recommended in that plan. Plaintiff claims all this testimony by Dr. Robert was an unfair surprise.

Defendants argue that it was clear that Dr. Robert's opinions were the foundation of the McNabb life care plan from both the title of the document, which contained his name, and Dr. Robert's participation in the preparation of the document. The McNabb life care plan listed three elements that would be necessary for the plaintiff in the future: (1) a one-time spine surgeon evaluation; (2) annual laboratory testing; and (3) annual internal medicine visits provided the plaintiff remained on medication. The McNabb life care plan defined "life care planning" as "a consistent methodology for analyzing all of the needs dictated by the onset of a catastrophic disability through to the end of life expectancy." Therefore, the McNabb life care plan was submitted, with the assistance of Dr. Robert, regarding the future medical needs of plaintiff. Plaintiff also admits she was provided a copy of Mr. McNabb's December 11, 2017 letter memorializing

11

his medical conference with Dr. Robert, which lists the majority of elements contained in the Savant life care plan as being not necessary.

Plaintiff objected at trial to Dr. Robert's testimony regarding the lifespan of artificial discs as being outside the scope of his IME report. The trial court noted Dr. Robert's expertise in the field and stated that it had allowed both sides much leeway in going outside the scope of their expert reports. When plaintiff later objected to Dr. Robert's testimony regarding the plaintiff's future medical needs, the trial court noted that Dr. Robert would be subject to cross-examination and that he could testify as to what would or would not be necessary from the Savant life care plan.

Generally, the trial court is granted broad discretion in making evidentiary rulings. The trial court's determinations will not be disturbed on appeal absent a clear abuse of discretion. *See Emery v. Owens-Corp.*, 2000-2144 (La. App. 1st Cir. 11/9/01), 813 So. 2d 441, 448, *writ denied*, 2002-0635 (La. 5/10/02), 815 So. 2d 842. Where a party asserts the trial court erred in permitting or excluding evidence, we must consider whether the challenged evidentiary ruling was erroneous and whether the error prejudiced the defendant. If not, a reversal is not warranted. *Emery*, 813 So. 2d at 449 (citing La. C.E. art. 103). The party challenging the trial court's evidentiary ruling bears the burden of proving that the error had a substantial effect on the outcome of the case when compared to the record in its totality. *See Emery*, 813 So. 2d at 449.

Furthermore, the trial court's discretion in controlling the admission of expert testimony is well established in Louisiana jurisprudence. *See* La. C.E. art. 702; *Mariakis v. N. Oaks Health Sys.*, 2018-0165 (La. App. 1st Cir. 9/21/18), 258 So. 3d 88, 95. The trial judge is vested with broad discretion in ruling on the scope of expert testimony. *D'Ambrosia v. Lang*, 2007-298 (La. App. 5th Cir. 4/29/08), 985 So. 2d 800, 809; *Estate of Francis v. City of Rayne*, 2007-359 (La. App. 3d

12

Cir. 10/3/07), 966 So. 2d 1105, 1112, *writ denied*, 2007-2119 (La. 2/15/08), 976 So. 2d 176.

Plaintiff relies on *Maddox v. Bailey*, 2013-0564 (La. App. 1st Cir. 5/19/14), 146 So. 3d 590, 596, where an orthopedic surgeon who performed an IME changed his entire theory of the cause of plaintiff's shoulder condition at trial, even though he had offered a drastically different opinion in a deposition given just two weeks earlier. The new medical theory was not contained in any discovery responses or in the deposition of the IME physician. This court held that the trial court abused its discretion in permitting the introduction of a new theory by the IME physician, and the trial court's legal error interdicted the jury's fact-finding process. Thus, this court conducted a *de novo* review. *Maddox*, 146 So. 3d at 599-601. The plaintiff also relies on *Anderson v. State ex rel. Dep't of Transp. & Dev.*, 2014-0605 (La. App. 1st Cir. 12/23/14), 2014 WL 7331955 (unpublished). *Anderson* held that the admission of a new exhibit regarding guardrails, which had not previously been produced in discovery, violated the objectives of Louisiana's discovery and pretrial procedures and amounted to a trial by ambush. This court held that the erroneous admission of the new evidence substantially prejudiced plaintiffs by materially affecting the outcome of the trial and depriving them of substantial rights. Since the trial court's legal error interdicted the jury's fact-finding process and the record was otherwise complete, this court conducted a *de novo* review of the record, omitting any consideration of the erroneously admitted evidence. *Anderson*, 2014 WL 7331955, at *5.

We find the cases relied upon by plaintiff distinguishable from the present matter. Dr. Robert did not introduce a new theory, and his testimony was not outside of the scope of the McNabb life care plan along with handwritten notes and correspondence produced therewith, upon which Dr. Robert collaborated. Mr. McNabb specifically stated that Dr. Robert collaborated with him to prepare the

13

life care plan by providing the foundation for the recommendations. The McNabb life care plan addressed plaintiff's probable future medical treatment. The McNabb life care plan excluded any future medical care for the replacement of the artificial disc, indicating that Mr. McNabb and Dr. Robert were of the opinion that such replacement was not necessary, which is exactly what Dr. Robert testified to at trial. Furthermore, as defendants point out, medical research addressing the life span of an artificial disc was listed as exhibits D19-21, and was introduced without objection.

We are further cognizant of the fact that prior to trial plaintiff filed a motion in limine, seeking to strike or limit the testimony of Mr. McNabb, arguing that his opinions regarding future medical care excluded the medical opinions of Dr. Dietze and Dr. Savant, but were instead based on other expert opinions favoring the defense and consultation with Dr. Robert, the IME doctor. Defendants opposed the motion in limine, noting that Mr. McNabb relied on the opinion of Dr. Robert, which happened to be contrary to the opinions of Dr. Dietze. Further, in defendant's opposition, the defendants argued that the artificial disc did not need to be replaced in thirty years because there was no medical literature to support such a position, which was "a fact established by Dr. Robert." Therefore, the plaintiff was placed on notice of Dr. Robert's opinions regarding future medical care. Furthermore, the defendants' witness list included Dr. Robert and the substance of his testimony, which included "future medical care." Finally, during the hearing on the motion in limine concerning Mr. McNabb's testimony, plaintiff's counsel stated:

> Mr. McNabb ... only talked to the Defendant IME doctor, who he says basically it was a soft tissue accident and she should have been tap dancing within six months after the accident, practically.

The record revealed that plaintiff was not blindsided when Dr. Robert offered testimony that the future replacement of the artificial disc was not necessary.

14

When questioning Mr. McNabb, plaintiff noted that the title might lead some to believe that Dr. Robert prepared the McNabb life care plan. Mr. McNabb testified that he collaborated with Dr. Robert in going through every line of the Savant life care plan. The McNabb life care plan listed each item/procedure from the Savant life care plan that was either not necessary or not related to the accident. We further note that plaintiff utilized the exact same process as the defense experts by having Dr. Savant collaborate with Dr. Dietze to develop the Savant life care plan. Consequently, we do not find that the trial court abused its discretion in determining that Dr. Robert's testimony as to future medical care was not outside the scope of the reports produced. *See Emery*, 813 So. 2d at 448-49.

**Scope of Dr. Robert's Expertise**

We are also not persuaded by the argument that Dr. Robert, a neurosurgeon, lacked the expertise to testify as to future medical care needed by plaintiff. Louisiana Code of Evidence article 702 governs the admission of expert testimony and provides, in pertinent part:

> A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

The trial court has great discretion in determining the qualifications of experts and the effect and weight to be given expert testimony. Trial courts are generally given wide discretion in determining whether a question or subject falls within the scope

15

of an expert witness's field of expertise. *McCurdy v. Ault*, 94-1449 (La. App. 1st Cir. 4/7/95), 654 So. 2d 716, 719, *writ denied*, 95-1712 (La. 10/13/95), 661 So. 2d 498. The decision to admit or exclude expert testimony is within the sound discretion of the trial court, and its judgment will not be disturbed by an appellate court unless it is clearly erroneous. *Devall v. Baton Rouge Fire Dept.*, 2007-0156 (La. App. 1st Cir. 11/2/07), 979 So. 2d 500, 503. Generally, the test of competency of an expert is the expert's knowledge of the subject about which he is called upon to express an opinion. *State v. Lutz*, 2017-0425 (La. App. 1st Cir. 11/1/17), 235 So. 3d 1114, 1132, *writ denied*, 2017-2011 (La. 8/31/18), 251 So. 3d 411. A combination of specialized training, work experience, and practical application of the expert's knowledge can combine to demonstrate that the person is an expert; a person may qualify as an expert based upon experience alone. *Lutz*, 235 So. 3d at 1132. Therefore, the factual basis for an expert's opinion determines the reliability of the testimony, and the trial court's inquiry must be tied to the specific facts of the particular case. *Robertson v. Doug Ashy Bldg. Materials, Inc.*, 2010-1552 (La. App. 1st Cir. 10/4/11), 77 So. 3d 339, 355, *writs denied,* 2011-2468, 2011-2430 (La. 1/13/12), 77 So. 3d 972, 77 So.3d 973.

The appellate court in *Sattler v. Hammond*, 93-1227 (La. App. 3d Cir. 5/4/94), 640 So. 2d 570, 573, *writ denied*, 94-1418 (La. 9/16/94), 642 So. 2d 198 (citations omitted), specifically stated:

> Although [La.] C.E. art. 702 et seq. has generally relaxed heretofore stringent requirements before witnesses may qualify as experts, greatly facilitating the use of expert testimony, the trial court still retains broad discretion as to whether expert testimony should be admitted, particularly in jury trials. However, generally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect or weight to be given such testimony, not to its admissibility.

Plaintiff contends that most of Dr. Robert's testimony regarding future medical care was outside the scope of his area of expertise as a neurosurgeon, and

directs this court to several instances where Dr. Robert stated that a question was outside his expertise and/or that he was incapable of predicting the future. (Appellant Brief at pp. 21-22; R. 2458, 2465, 2491-93, 2462, 2475-77, 2494).

Based upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Louisiana Supreme Court has determined that pursuant to La. C.E. art. 702, expert testimony is admissible if it satisfies the following:

> 1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Cheairs v. State ex rel. Dep't of Transp. & Dev.,* 2003-0680 (La. 12/3/03), 861 So. 2d 536, 542. Plaintiff claims that factors one and three above were violated by the trial court.

As to future medical expenses, both sides presented widely divergent life care plans. Plaintiff presented the Savant life care plan prepared with the assistance of Dr. Dietz, a neurosurgeon. Defendants presented the McNabb life care plan prepared with the assistance of Dr. Robert, a neurosurgeon. Dr. Savant's life care plan included the following: (1) evaluations for durable medical equipment, family therapy, internal medicine, nutritional consultation, occupational therapy, pain psychology, physical medicine and rehabilitation, physical therapy, psychiatric, sleep medicine specialist, spine surgeon, vocational rehabilitation; (2) future diagnostic imaging, EMG/NCV, laboratory testing, internal medicine, physical medicine and rehabilitation, pre-op diagnostics, post-op x-rays, and post-op office visits; (3) home care and housekeeping; (4) medications, including Klonopin, Zoloft, Flexeril, Soma, Voltaren, Duexis, Gabapentin, and Hydrocodone; (5) plan administration; (6) surgical spine surgery in approximately

thirty years; and (7) therapeutic services, including cervical ESIs, lumbar ESIs, occupational therapy, physical therapy, trigger point injections, pain psychologist, psychiatrist, health and strength medicine, and post-op physical therapy. Dr. Dietze testified that nothing in the Savant life care plan was medically objectionable.

Dr. Robert admitted at trial that he was unaware of the plaintiff's current condition, but that he had no indication she needed durable medical equipment, such as a wheelchair or a walker. He explained that family therapy was not within his area of expertise, but that he would not recommend family therapy if she were his patient. With regard to the psychiatric medications, Klonopin and Zoloft, he stated that these medications were prescribed for treatment of depression, which was outside his area of expertise. However, as a neurosurgeon, he could say that these medications were not related to a cervical spine operation. He also noted that plaintiff had been taking these medications since 2005. The Savant life care plan included a recommendation for physical medicine and rehabilitation care four times a year for thirty-one years. Dr. Robert testified that no physician could make that prediction into the future. He also stated that there was no way to predict if the artificial disc would have to be replaced in thirty years and that it was speculative to include future cervical or lumbar ESIs or trigger point injections.

We note that with regard to the need for the future replacement of the artificial disc, Dr. Robert testified that he was licensed and qualified to perform artificial discectomies and had been certified to perform artificial disc surgery. He explained that artificial discs were approved for life, rather than needing to be replaced in thirty years. The trial court permitted this testimony, specifically stating:

> --with regard to his expertise, I'm going to allow him, if he knows, about the life expectancy of the artificial disc, and I will note that I – I've afforded both sides much leeway in going outside the scope of

18

their expert's [r]eport, and ... I'm going to allow it, because I think he's an expert in the field.

With regard to Dr. Robert's testimony as to the lack of need for durable medical equipment, the trial court noted that Dr. Robert was going over the Savant life care plan, and that he could rely on his expertise to testify as to the necessity. The trial court allowed Dr. Robert to testify as to whether the evaluations listed in the Savant life care plan were necessary. The trial court stated that the plaintiff's experts had testified as to the evaluations being needed, so Dr. Robert could give his opinion as to whether they were necessary. Plaintiff claims that Dr. Robert's statements regarding his inability to predict the future disqualified him from testifying as to future medicals. However, taking Dr. Robert's testimony in its entirety, he was adamant that it was impossible for any physician to predict with any certainty whether plaintiff would require the multitude of tests, procedures and treatment predicted by Dr. Savant.

We do not find that Dr. Robert's testimony regarding the future medical treatment of plaintiff went beyond the scope of his medical expertise such that it should have been excluded. *See Succession of Werner v. Zarate*, 2007-0829 (La. App. 1st Cir. 12/21/07), 979 So. 2d 506, 510; *Gonzalez v. Government Employees Ins. Co.*, 2009-140 (La. App. 5th Cir. 2/9/10), 32 So. 3d 919, 927. Therefore, we do not find that the trial court abused its discretion in determining that Dr. Robert's testimony as to future medical expenses was not outside his medical expertise.

**Proper Foundation**

Plaintiff also claims that Dr. Robert's testimony as to her future medical needs lacked foundation and does not constitute competent evidence of such quality and weight that reasonable and fair-minded people in the exercise of impartial judgment might reach a different conclusion about the proper amount needed to compensate plaintiff for her future medical needs.

Louisiana Code of Evidence article 702, as set forth above, lays the foundation for expert testimony. Comments to the article clarify that the test for admissibility of expert testimony turns upon whether the particular specialized knowledge would assist the trier of fact to understand the evidence or to determine a fact at issue. La. C.E. art. 702 comments (a) and (c). Further, broad discretion should be accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. La. C.E. art. 702 comment (d). A trial court's judgment with respect to such matters should not be disturbed on appeal unless manifestly erroneous. *Oddo v. Asbestos Corp. Ltd.*, 2014-0004 (La. App. 4th Cir. 8/20/15), 173 So. 3d 1192, 1210, *writ denied*, 2015-1712 (La. 11/6/15), 180 So. 3d 308.

The plaintiff objected several times at trial to Dr. Robert's testimony as to future medical care lacking a foundation. Plaintiff argued that Dr. Savant was a certified life care planner, and Dr. Robert was not. The trial court made no distinction as to whether the experts were certified life care planners, and based its decision on the fact that both Dr. Robert and Dr. Dietze were neurosurgeons who evaluated the life care plans to make their determinations as to what future medical care would be necessary. Given the trial court's broad discretion as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert, we find no abuse of discretion on the part of the trial court in determining that Dr. Robert's testimony as to plaintiff's future medical needs was based upon a proper foundation.

As we find no evidentiary errors on the part of the trial court in admitting the testimony of Dr. Robert regarding future medical expenses, *de novo* review is not warranted. We, therefore, conduct a review using the manifest error/clearly wrong standard.

## Future Medical Expenses

Applying the manifest error of review, we must determine if the jury award of $12,000.00 for future medical expenses was manifestly erroneous. Plaintiff argues that her entitlement to $2,498,243.05 in future medical expenses is so overwhelming that, even if the court conducts a manifest error review, it should still reverse the jury's award of $12,000.00 for future medical expenses. In reviewing a factual finding regarding special damages, the issue is whether the trial court's conclusion was reasonable in light of the record as a whole. *Menard v. Lafayette Ins. Co.*, 2009-1869 (La. 3/16/10), 31 So. 3d 996, 1007.

To recover future medical expenses a plaintiff must prove those expenses more probably than not will be incurred. A plaintiff shows the probability of future medical expenses with supporting medical testimony and estimation of their probable cost. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary. *Menard*, 31 So. 3d at 1006.

Notably, it is well acknowledged that an award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty. Such awards "generally do not involve determining the amounts, but turn on question of credibility and inferences, i.e., whose experts and other witnesses does the jury believe?" *Menard*, 31 So. 3d at 1006 (*quoting* Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law* § 7.02, 7–4(Michie 2009)).

Much discretion is left to the judge or jury in its assessment of quantum, both general and special damages. La. C.C. art. 2324.1. As a determination of fact, a judge's or jury's assessment of quantum, or the appropriate amount of damages, is one entitled to great deference on review. *Menard*, 31 So. 3d at 1006-07.

> [T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

*Menard*, 31 So. 3d at 1007 (*quoting Guillory v. Lee*, 2009-0075 (La. 6/26/09), 16 So. 3d 1104, 1116-17). "Because the discretion vested in the trier of fact is so great, and even vast, an appellate court *should rarely disturb* an award on review." *Menard*, 31 So. 3d at 1007 (*quoting Guillory*, 16 So. 3d at 1117 (emphasis added)).

An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: *there must be no **reasonable** factual basis for the trial court's conclusion, and the finding must be clearly wrong.* This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. The issue to be resolved on review is not whether the jury was right or wrong, but whether the jury's fact finding conclusion was a reasonable one. *Menard*, 31 So. 3d at 1007.

Notably, reasonable persons frequently disagree regarding the measure of damages in a particular case. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. An appellate court on review must be cautious not to re-weigh

22

the evidence or to substitute its own factual findings just because it would have decided the case differently. *Menard*, 31 So. 3d at 1007.

**Manifest Error Review**

The record reveals the jury was presented with two competing views based on expert medical testimony regarding the extent of plaintiff's future medical treatment. Plaintiff relied upon the testimony of Dr. Savant and Dr. Dietz to establish that she would need future medical care for the rest of her life as a result of the accident in the amount of $2,498,243.05. Defendants presented the testimony of Dr. Robert and Mr. McNabb to demonstrate that the future medical care sought by plaintiff was not warranted. Mr. McNabb indicated that plaintiff's future medical needs were $10,587.00. Dr. Robert based his testimony on the physical examination he conducted of plaintiff, his review of her medical records, and his evaluation of the Savant life care plan regarding plaintiff's future need for medical treatment in the form of medical evaluations, medical equipment, future spinal surgery, epidural steroid injections, occupational and physical therapy, trigger point injections, and medications. As to the Savant life care plan, the defendants elicited on cross-examination that Dr. Savant had conducted no research and produced no supporting documentation for her opinions as to future medical treatment. Dr. Savant agreed that the Savant life care plan was prepared "off the top of [her] head" based on her experience.

Plaintiff argues that Mr. McNabb was not a physician, but became a certified life care planner in 2016 even though he has a bachelor's degree in education and journalism. Mr. McNabb collaborated with Dr. Robert and only presented the items in the McNabb life care plan to which Dr. Robert did not object. On cross-examination, Mr. McNabb admitted that he did not review any depositions of the treating physicians. Plaintiff further avers that Dr. Savant, a double board certified neurologist and psychiatrist who is also a certified life care planner collaborated

with Dr. Dietz, a neurosurgeon, to develop the Savant life care plan. Plaintiff claims the Savant life care plan more accurately represented her future medical needs.

A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. The trier of fact may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole. *Green v. K–Mart Corp.*, 2003-2495 (La. 5/25/04), 874 So. 2d 838, 843. As evident by its verdict, the jury made a factual finding that plaintiff's future medical needs from the April 8, 2015 accident were not as severe as she claimed. The jury, in awarding plaintiff only some of the future medical expenses she sought, clearly accepted the position advanced by defendants that plaintiff's injuries would resolve in time and would not necessitate the frequency or duration of treatment nor the costs predicted by plaintiff's experts. Based on our review of the evidence contained in the record, as to each category of treatment and its correlating cost, we find this conclusion is reasonable.

Given the sum awarded, we can infer that the jury did not find that plaintiff proved by a preponderance of the evidence the need for the continued treatment of all the items listed in the Savant life care plan. As the jury was presented with alternative testimony that plaintiff's accident did not cause the necessity of the amount of future medical expenses she sought, we find a reasonable basis did exist for the amount of the jury award of future medical expenses. We do not find that this is one of the rare cases when there are opposing views that a reasonable basis does not exist for the jury's verdict. Given that the medical evidence introduced by plaintiff was highly contested by defendants, we find that reasonable persons in the exercise of impartial judgment could reach different conclusions as to plaintiff's claim for future medical expenses. Accordingly, we find that the trial court properly denied plaintiff's motion for JNOV as to their claim for future medical

24

expenses and we affirm the jury's verdict of $12,000.00 for future medical expenses.

## ANSWER TO APPEAL

Defendants answer the appeal, alleging that the jury committed manifest error in the amounts of both general and special damages awarded to the plaintiff, alleging that the majority of plaintiff's damages were caused by the November 30, 2015 accident, rather than the April 8, 2015 accident.

The trial court's finding regarding causation is a factual finding and must be reviewed under the manifest error standard. In a personal injury suit, the plaintiff has the burden of proving by a preponderance of the evidence a causal connection between the injury sustained and the accident that caused the injury. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injury was caused by the accident. *Oden v. Gales*, 2006-0946 (La. App. 1st Cir. 3/23/07), 960 So. 2d 114, 118. When a conclusion regarding medical causation is not one within common knowledge, expert medical testimony is required in a tort action. *Hutchinson v. Shah*, 94-0264 (La. App. 1st Cir. 12/22/94), 648 So. 2d 451, 452, *writ denied*, 95-0541 (La. 4/21/95), 653 So. 2d 570. In situations involving multiple accidents, whether preceding or subsequent to the accident at issue, a tortfeasor is liable only for the direct and proximate results of his wrongful acts, including aggravation of any preexisting injuries. Although a tortfeasor takes his victim as he finds him, the tortfeasor cannot be held liable for injuries which are not attributable to the wrongful act. *Coleman v. Lewis*, 99-0094 (La. App. 1st Cir. 3/31/00), 757 So. 2d 907, 908, *writ denied*, 2000-1850 (La. 9/22/00), 768 So. 2d 1291. In such situations, the plaintiff is required to prove a causal connection between the damages claimed and the accident by a reasonable preponderance of the evidence. Proof by direct or circumstantial evidence is

25

sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not. *Coleman*, 757 So. 2d at 908.

Following the April 8, 2015 accident, plaintiff was seen at Oschner Family Medicine Clinic complaining of headaches and neck pain. She thereafter sought treatment from a chiropractor. On April 24, 2015, plaintiff was seen by Dr. Smith complaining of neck pain and radiating arm pain. Based on an MRI he ordered, Dr. Smith diagnosed plaintiff with a protruding disc at C5-6 and ordered a cervical ESI. Dr. Elkersh first treated plaintiff for pain on May 6, 2015, and did not believe she was in need of surgical intervention at the time. He performed the ESI on May 26, 2015. On June 10, 2015, plaintiff had some improvement of radicular pain from the injection, but was continuing to have other pain. (R. 2249-50). Due to continued muscular pain, Dr. Elkersh referred plaintiff for acupuncture and trigger point injections, which were performed on September 23, October 21, and November 18, 2015. Plaintiff also saw Dr. Smith on October 9, 2015, reporting occasional tingling in her left arm and soreness in her neck and trapezius muscle. He ordered physical therapy. Neither Dr. Smith nor Dr. Elkersh considered surgery for plaintiff prior to the November 30, 2015 accident.

Dr. Dietze originally treated plaintiff on March 10, 2016, after she had been involved in both accidents. At this time, plaintiff reported that her symptoms began with the first accident until the time of the November 30, 2015 accident, which made her symptoms more intense. Based on his examination of plaintiff and review of the MRI scans performed April 29, December 2, and December 8, 2015, Dr. Dietze opined that the April 8, 2015 accident caused the disc herniation that generated symptoms that did not completely resolve by the November 30, 2015 accident. He believed the November 30, 2015 accident did cause an aggravation of her symptoms, but there was no doubt that the April 8, 2015

accident herniated the disc. On her first visit, Dr. Dietze determined that plaintiff required cervical surgery, since she had been living with symptoms for nine months. Dr. Dietze explained that Dr. Smith's conservative treatment of plaintiff was appropriate given she only treated with Dr. Smith for three months after the accident. Dr. Dietze testified that based on a comparison of the MRIs, there was no physical changes in the disc herniation; only plaintiff's pain level increased. Dr. Dietze recommended a cervical injection, which was performed on May 4, 2016. She underwent a third injection on November 30, 2016. Dr. Dietze performed the cervical surgery on December 8, 2016. Dr. Dietze explained that although statistically 80% of patients with plaintiff's injury improve within six months, she was still being treated seven months later before the November 30, 2015 accident. Because she was still being treated, and he found no objective changes on the MRI scans following the November 30, 2015 accident, he concluded that the surgery was related to the first accident.

The jury was also presented with evidence that plaintiff had filed a lawsuit in connection with the November 30, 2015 accident, claiming aggravation to preexisting conditions and the severity of that accident. The plaintiff testified that following the April 8, 2015 accident she experienced severe headaches where her back and neck meet, pain in her neck, and pain between her shoulder blade and spine. She testified that prior to the November 30, 2015 accident, she was no more than 10% improved. Plaintiff testified that her neck pain from the herniated disc caused by the April 8, 2015 accident was exacerbated by the November 30, 2015 accident, and her thoracic back pain was made worse.

Defendants assert that the jury committed clear abuse of discretion by accepting the testimony of a non-treating physician at the time of the two accidents, Dr. Dietze, over the two treating physicians, Dr. Smith and Dr. Elkersh, who treated plaintiff immediately after the accident. *See Wild v. Continental*

27

*Casualty Company*, 234 So. 2d 783, 784-85 (La. App. 1st Cir. 1970). While courts have generally followed the jurisprudential rule that a treating physician's opinion is given more weight than a non-treating physician's, courts applying that doctrine have held that the treating physician's testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all medical witnesses. The proper inquiry is whether, based on the totality of the record, the fact-finder was manifestly erroneous in accepting the expert testimony presented by Dr. Dietze, over that presented by Dr. Smith and Dr. Elkersh, the treating physicians at the time of both accidents. *See Ladner v. Gov't Employees' Ins. Co.*, 2008-0323 (La. App. 4 Cir. 10/8/08), 992 So. 2d 1098, 1104, *writ denied*, 2008-2864 (La. 2/6/09), 999 So. 2d 783; *see also Miller v. Clout*, 2003-0091 (La. 10/21/03), 857 So. 2d 458, 462.

Dr. Dietze explained that the conservative treatment of Dr. Smith and Dr. Elkersh was warranted in the first seven months after the accident; that it was not uncommon for physicians not to discuss surgery within the first three months post-accident; that he actually treated plaintiff nine months after the first accident; and that she was still complaining of pain. The jury heard all the evidence, including the testimony of defense experts, and apparently chose to believe Dr. Dietze that plaintiff's disc herniation was caused by the April 8, 2015 accident. As the trier of fact, the jury had to make credibility determinations when considering the testimony of each witness, including expert witnesses. *See Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Sys. of Calcasieu, Inc.*, 99-201 (La. 10/19/99), 748 So. 2d 417, 421. It was the jury's prerogative to accept or reject, in whole or in part, expert opinions. *See Lirette v. State Farm Ins. Co.*, 563 So. 2d 850, 852 (La. 1990).

In assessing quantum for both general and special damages in cases of offenses, it is well-settled that a jury is given great discretion. *See* La. C.C. art.

2324.1. Further, the jury's assessment of quantum or determination of the appropriate amount of damages is a determination of fact, which is entitled to great deference on appeal. An appellate court's review of the amounts awarded by the jury for general and special damages is subject to the "abuse of discretion" standard of review. An appellate court must be cautious not to re-weigh the evidence or substitute its own factual finding just because it would have decided the case differently. An appellate court may disturb a damages award and resort to a review of prior similar awards only after an articulated analysis of the facts reveals an abuse of discretion. *Cooper v. Barr*, 2013-1857 (La. App. 1st Cir. 5/2/14), 2014 WL 1778281 (unpublished), *writ denied*, 2014-1169 (La. 9/19/14), 149 So. 3d 245. Therefore, in the present case, we find no abuse of discretion and do not disturb the past and future medicals, wages, or general damages. The answer to appeal is denied.

## CONCLUSION

For the above and foregoing reasons, we affirm the trial court's March 28, 2018 judgment on the jury verdict and July 11, 2018 judgment granting defendants' motion for JNOV and denying plaintiff's motion for JNOV and alternative motions for new trial and/or additur. We deny defendants' answer to the appeal. All costs of this appeal are assessed one-half against Esther Redmann Giavotella and one-half against Ryan Mitchell and Travelers Indemnity Company.

**AFFIRMED; ANSWER TO APPEAL DENIED.**

29